[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-13933
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 6, 2012
JOHN LEY
CLERK

D.C. Docket No. 9:10-cv-81275-KAM

LARRY D. BUTLER,

Plaintiff - Appellant,

versus

SHERIFF OF PALM BEACH COUNTY,
DORETHEA COLLIER,
individually,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 6, 2012)

Before CARNES, BARKETT, and BLACK, Circuit Judges.

CARNES, Circuit Judge:

In one of his ballads, Jim Croce warned that there are four things that you just don't do: "You don't tug on Superman's cape/ You don't spit into the wind/ You don't pull the mask off that old Lone Ranger/ And you don't mess around with Jim."[1]  He could have added a fifth warning to that list:  "And you don't let a pistol-packing mother catch you naked in her daughter's closet."

## I.

It all started with a phone call.[2]  Nineteen-year-old Uzuri Collier called Larry Butler, who was of a similar age, and invited him to her house.  Butler responded to the invitation the way most young men over the age of consent would have—he went.  Once Butler was at Uzuri's house, he and she consented to watch television for a while.  Then they consented to do what young couples alone in a house have been consenting to do since the memory of man (and woman) runneth not to the contrary.  The record does not disclose how long these two young people had known each other in the dictionary sense, but that afternoon in Uzuri's bedroom they also knew each other in the biblical sense.  While doing so,

---

[1]Jim Croce, You Don't Mess Around With Jim (ABC Records 1972).

[2]Because this is an appeal from a Federal Rule of Civil Procedure 12(b)(6) dismissal, we draw the facts from the amended complaint, accepting those facts as true and construing them in the light most favorable to the plaintiff.  Lanfear v. Home Depot, Inc., 679 F.3d 1267, 1271 n.4 (11th Cir. 2012).

and while clothed in the manner that is customary in such matters, which is to say not at all, they heard someone coming into the house.

The record does not tell us how the timing worked out as unfortunately as it did. It may be that the two young people simply lost track of time, which would be understandable given the circumstances. Or it may be that Uzuri's mother, Dorethea Collier, left work early that day. However it happened, Collier came close to catching the couple coupling. So close that when they heard her, Butler had only enough time to dash into the bedroom closet wearing nothing but a look of surprise.

Collier was a corrections officer at the Eagle Academy, which is a "boot-camp facility for minors" run by the Palm Beach County Sheriff's Office. She was wearing her uniform and gun belt with pistol and "[u]pon entering the room, she began demanding that Uzuri explain why she was undressed and what she was doing." While talking with her daughter, Collier took off her utility belt and threw it on the bed. Sometime thereafter—the implication is sooner rather than later—Collier discovered Butler stark naked in her daughter's closet. She yelled at him and punched him one time. Then Collier picked up her utility belt, put it back on, and drew her gun. She told Butler that if he moved or did not follow her commands, she would shoot him.

Butler tried to explain that Uzuri had invited him to the house, but Collier insisted that he must have broken in. She had the still-naked Butler turn around, she handcuffed him, and she made him get down on his knees. After staying there "for a prolonged period," Butler pleaded with Collier that he could not maintain that position any longer. Collier responded by telling him to bend over or she would shoot him. She "made numerous threats against Butler, [telling him] that she would 'kill him' if he did not obey her commands."

While still holding Butler at gunpoint, Collier called her husband and told him to come home immediately. After that, she called a supervisor at Eagle Academy and asked what charges she could bring against Butler for entering the house and "engaging in sexual relations with her daughter." The supervisor told Collier that if Butler had entered without permission he could be charged with trespassing and rape, but that if he had been invited in, she would have to let him go. About this time, Collier's husband arrived at the house, and he "also assaulted Butler." In what manner, we are not told.

Collier continued to hold Butler at gunpoint, threatening to kill him if he did not follow orders. After Collier's husband "inquired further" about the naked man's identity and determined who he was, Butler was allowed to get dressed and leave, although Collier kept the gun pointed at him while he was dressing. One

4

can assume that it did not take Butler long to get dressed and get out, but before he had time to leave Collier "warned him about the consequences of filing charges or even 'thinking about' reporting the incident."  She told Butler that if he reported what had happened, she "would submit a report to discredit him and would engage in some 'creative writing' if necessary to justify the filing of charges against him for trespassing on the property."  Despite those threats, Butler eventually reported the incident to law enforcement.  There is no allegation that Collier responded by submitting a report of her own or by filing trespassing charges against Butler.

## II.

Butler filed a lawsuit in Florida state court against Collier, individually and in her official capacity as a corrections officer with the Palm Beach County Sheriff's Office, and against Ric Bradshaw, the Sheriff of Palm Beach County, Florida, in his official capacity only.  Butler's complaint claimed that Collier had violated 42 U.S.C. § 1983 by using "plainly excessive and disproportionate force on Butler to effect an unlawful and unreasonable search and seizure" (Count II). His complaint also included a state law claim of "battery/excessive force" against Collier in her official capacity (Count III), and state law claims against her both individually and in her official capacity for false imprisonment (Counts IV & V) and for intentional and negligent infliction of emotional distress (Counts VI–IX).

The claim against Sheriff Bradshaw was a derivative one, asserting that he had as a matter of policy, practice, and custom inadequately trained, disciplined, and supervised deputies and others under his supervision, including Collier, resulting in violations of § 1983 (Count I).

Collier and Bradshaw removed the case to federal district court, see 28 U.S.C. § 1441(a), based on federal question jurisdiction, see id. § 1331, which was premised on the § 1983 claims. The defendants each filed a motion to dismiss the complaint. In a written response to the motions to dismiss his §1983 claims, Butler contended that Collier had acted under color of law by, among other things, attempting to charge him with a crime, asserting that: "[s]he contacted officials at the Eagle Academy . . . about what charges she could bring against plaintiff. She even sought to charge Plaintiff with trespassing but was overridden by her supervisor." [3] Because Butler's arguments against dismissal relied on facts that were not in the complaint itself, the court dismissed the complaint with leave to file an amended one.

Butler filed an amended complaint, asserting the same claims against the

_____

[3]At the hearing on the motions to dismiss, Butler's attorney told the district court: "[S]he sought to arrest him, she detained him, I believe once other officials from the sheriff's office arrived." However, the amended complaint, which was filed thereafter, does not allege, or even imply, that anyone from the Sheriff's Office, other than Collier herself, arrived at the house. In reviewing the dismissal of the amended complaint we are limited to the allegations that it contains.

defendants, except for the negligent infliction of emotional distress claims (originally Counts VII & IX), which he had already agreed to dismiss. The defendants each filed a motion to dismiss the amended complaint. They argued, among other things, that the allegations still did not show Collier had acted under color of law.

The district court concluded that the allegations in the amended complaint showed no more than Collier acting as a private individual because nothing she allegedly did to Butler relied on or invoked her authority as a law enforcement officer. For that reason, the court once again dismissed Butler's § 1983 claims under Rule 12(b)(6). Because Butler had been unable to state a federal claim despite being given an opportunity to amend the complaint, the court concluded that any further attempts to amend would be futile and made the dismissal with prejudice. The court declined to exercise supplemental jurisdiction over Butler's state law claims, remanding them to state court.[4]

### III.

"We review de novo the district court's grant of a motion to dismiss under

---

[4]Butler does not contend that the district court abused its discretion in declining to exercise supplemental jurisdiction over the state law claims and remanding them to state court, if the court was correct that he failed to state a claim under § 1983. See 28 U.S.C. §§ 1367(c)(3), 1441(c)(2).

12(b)(6) for failure to state a claim, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." Ironworkers Local Union 68 v. AstraZeneca Pharm., LP, 634 F.3d 1352, 1359 (11th Cir. 2011) (quotation marks omitted). The plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1965 (2007) (citations omitted). To survive a motion to dismiss, the plaintiff must plead "a claim to relief that is plausible on its face." Id. at 570, 127 S.Ct. at 1974.

IV.

Section 1983 does not federalize all torts or other deprivations of rights committed by a person who is a law enforcement officer or other government agent. Instead, the statute covers only those deprivations committed "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. That requirement is more concisely referred to as the "acting under color of state law" element. Almand v. DeKalb Cnty., Ga., 103 F.3d 1510, 1513 (11th Cir. 1997) (holding that to establish a § 1983 claim, a plaintiff must show that he "was deprived of a federal right by a person acting under color of state law"). A defendant acts under color of state law

when she deprives the plaintiff of a right through the exercise of authority that she has by virtue of her government office or position.[5]  Id.  The dispositive question is whether the defendant was exercising the power she possessed based on state authority or was acting only as a private individual.  Id.  The Supreme Court has explained that the "acts of officers in the ambit of their personal pursuits are plainly excluded" from being under color of law, while the "[a]cts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it."  Screws v. United States, 325 U.S. 91, 111, 65 S.Ct. 1031, 1040 (1945).

Our decision in Almand (which is controlling authority) and the Fifth Circuit's decision in United States v. Tarpley, 945 F.2d 806 (5th Cir. 1991) (which is persuasive authority), illustrate the line that is drawn in § 1983 cases of this type.  In the Almand case, we considered the conduct of a police officer who forced his way into a woman's apartment and raped her.  103 F.3d at 1511–12.  The woman had originally let the officer in "because of his status as a police officer" and his proffer of information about those responsible for the rape of the woman's daughter about a month earlier.  Id. at 1514–15.  Afterwards, when he

---

[5]The terms "under color of state law" and "state action" refer to the same kind of conduct in the context of a § 1983 claim; an official who has acted under color of state law has engaged in state action.  See id. at 1514 n.7.

9

propositioned her, the woman told the officer to leave and after he did she closed the door.  Id. at 1515.  Immediately thereafter, the officer:  "forced open the closed door with such shock that wood broke off the door.  Having pushed open the door, [he] reentered [her] apartment, physically struggled with her, and forcibly raped her."  Id. at 1512.

We concluded in Almand that the officer's conduct in breaking in and raping the woman was a private act, not accomplished because of power he possessed under state law, and in that respect "he was no different from any other ruffian."  Id. at 1515.  We explained that "any thug or burglar could have committed the same violent acts."  Id.  For those reasons, we decided that the officer's "conduct (if he did the things alleged) was the act of a private citizen and did not violate the Constitution," and we concluded that the district court should have granted summary judgment in his favor on the § 1983 claim.  Id.

The Tarpley case was different.  William Tarpley, a deputy sheriff, devised a plan to assault Kerry Vestal, a man who had engaged in an extramarital affair with Tarpley's wife.  Tarpley, 945 F.3d at 807.  With the help of his faithless wife, Tarpley planned to lure Vestal to his house for the assault.  See id. at 807–08.  While at the sheriff's station, Tarpley and a fellow deputy, Michael Pena, made "sap gloves," which have "rubber hosing filled with metal or lead shot attached to

10

the fingers." Id. at 808. Tarpley planned to use those weapons to attack Vestal.

See id.

When the unsuspecting Vestal arrived at Tarpley's house, the wife pulled him inside where Tarpley tackled him and repeatedly hit him in the head. Id. Tarpley then put his service pistol in Vestal's mouth, and told him that "he was a sergeant on the police department, that he would and should kill Vestal, and that he could get away with it because he was a cop." Id. Tarpley said, "'I'll kill you. I'm a cop. I can.'" Id. The Tarpleys then summoned Deputy Pena to the house, and Tarpley told Vestal that Pena was "a fellow sergeant from the police department." Id. Deputy Pena confirmed to Vestal that Tarpley had shot people in the past. Id. After the two deputies finally let Vestal go, they followed him in Pena's squad car and radioed another officer to do the same. Id. Both squad cars followed Vestal to the edge of town. Id.

Faced with a § 1983 claim, Tarpley contended that "he was acting as a jealous husband, not as a police officer." Id. at 809. The Fifth Circuit rejected that contention, holding that there was sufficient evidence for a jury to find that Tarpley acted under color of law.[6] Id. The court reasoned:

---

[6]The court was conducting the "under color of law" analysis for the purpose of applying a criminal statute, 18 U.S.C. § 242. It did not, however, distinguish between the meaning of the phrase in that statute and its meaning in the context of a § 1983 claim but instead relied on §

11

Tarpley did more than simply use his service weapon and identify himself as a police officer. At several points during his assault of Vestal, he claimed to have special authority for his actions by virtue of his official status. He claimed that he could kill Vestal because he was an officer of the law. Significantly, Tarpley summoned another police officer from the sheriff's station and identified him as a fellow officer and ally. The men then proceeded to run Vestal out of town in their squad car. The presence of police and the air of official authority pervaded the entire incident.

Id.

Butler relies on the Tarpley decision as persuasive authority, but the present case is closer to our binding precedent in Almand than it is to Tarpley. As in Almand, Collier's conduct, or misconduct, was not accomplished because of her status as a corrections officer. Just as "any thug or burglar could have committed the same violent acts" as the officer in Almand, 103 F.3d at 1515, any irate mother with an anger management problem could have done what Collier did.[7]

---

1983 decisions. See Tarpley, 945 F.3d at 808–09.

[7]Butler's counsel admitted as much in the hearing on the defendants' first motions to dismiss. The court asked:

Well, let's assume she never arrested him. She's just an angry mother yelling and screaming at this man, naked man that she finds in her house with her daughter and does everything she did other than arrest him and calls the authorities. She's just an angry, very angry woman, would that have been state action even though she had a badge and she had handcuffs and she had a gun and she had her uniform on?

Again, assume she pointed the gun at him, she put the handcuffs on him and she's yelling and screaming at him and threatening him but never says you're under arrest and never says I'm calling the police because you committed a crime

This case actually presents a weaker basis for a finding of action under color of state law than the Almand case did. Unlike the defendant in that case, Collier did not use her law enforcement position to strike up a relationship with the victim or to initially gain access to the house where the assault took place. It was Collier's house and she walked in just like any private individual returning home from work. Collier's discovery of a naked man in her daughter's closet was not the result of an official search by a law enforcement officer. When Collier punched Butler, she was acting as an enraged parent; she was not purporting to exercise her official authority to subdue a criminal for purposes of an arrest. When she handcuffed and detained Butler, Collier did not purport to be exercising her authority to arrest a criminal. When she called her husband, she was acting as a wife and parent, not as an officer. And when Collier called her place of work, a boot camp facility for minors, for advice about whether Butler could be charged with a crime, she did no more than an ordinary citizen could do by simply requesting information from law enforcement authorities about whether Butler's conduct was criminal.

---

and never attempts to use the law against him. She's just using, she's just being an angry person, she just happens to have some of these law enforcement tools with her, would that be a state action?

Butler's counsel answered: "I don't believe so."

Although Collier did use the pistol that she wore as an officer, any adult without a felony record can lawfully possess a firearm (and tens of millions do). A law enforcement officer who gets into an after-hours dispute with her domestic partner that tragically escalates into a shooting does not act under color of law merely because the weapon used is the firearm the officer carries on duty. As for the handcuffs, the law does not restrict possession of them to law enforcement officers. In any event, there is no reason to believe that Collier would not have done, or been able to do, what she did to Butler without her handcuffs. They were incidental, not essential, to his detention.

In the Tarpley case, by contrast, the defendant deputy used his position and authority to assault and intimidate the victim. He planned the assault with another deputy while at the sheriff's office. Tarpley, 945 F.3d at 808. He enlisted that other deputy's help in carrying out the assault, and he used law enforcement vehicles to accomplish his goals. Id. During the assault he repeatedly reminded the victim that he was a law enforcement officer and even told the man that because he was an officer he could get away with shooting and killing him. Id. ("He repeated 'I'll kill you. I'm a cop. I can.'"). Collier, unlike Tarpley, did not use her position and authority to plan the detention and assault of the victim; she did not enlist the aid of another officer in her misconduct; she did not repeatedly

14

remind the victim that she was a law enforcement officer; she did not boast to him that as an officer she could get away with killing him. The only other person whose help Collier sought as the events unfolded was her husband, and there is no allegation that he was a law enforcement officer. When Butler left, Collier did not follow him in a law enforcement vehicle—there is no allegation that she even had one—or radio another officer to follow Butler in that other officer's official vehicle.

The allegations are that Collier warned Butler that if he reported what had happened she would, in effect, lie about it in a report of her own or file charges against Butler for trespassing on her property. But any private citizen can submit a report to law enforcement and seek criminal charges against another person. Cf. Fla. Stat. § 817.49 (providing that it is a misdemeanor to convey "to any law enforcement officer false information or reports concerning the alleged commission of any crime under [Florida law], knowing such information or report to be false, in that no such crime had actually been committed")

A § 1983 defendant who abuses the power and authority given to her by the state acts under color of state law. See Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001); United States v. House, No. 10–15912, — F.3d —, slip op. at 43, 49–50 (11th Cir. June 20, 2012). "What [§ 1983] seeks to prevent is

15

the '[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law . . . .'" Dunwoody Homeowners Ass'n, Inc. v. DeKalb Cnty., Ga., 887 F.2d 1455, 1460 (11th Cir. 1989) (quoting United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043 (1941)). As we have recently had occasion to reiterate, an act is effected under color of law "if it is effected by a law enforcement officer acting 'under pretense of law.'" House, No. 10–15912, slip op. at 43 (quoting Screws, 325 U.S. at 111, 65 S.Ct. at 1040).[8] There was a misuse of official power and authority in the Tarpley case where the deputy acted under pretense of law, but not in this case. As the district court correctly stated: "Collier was an angry parent who happened to be in uniform, have handcuffs, and a firearm, which she used for the private ends of assaulting and scaring a young man she caught in bed with her daughter."[9] What she did to Butler was not "made possible only because [she was] clothed with the authority of state law." Dunwoody Homeowners Ass'n, 887 F.2d at 1460. Any other angry parent with a firearm in the house could have done what Collier did.

_____

[8]The House case involved "under color of law" for purposes of a prosecution under 18 U.S.C. § 242 but, as we have already noted, the phrase has the same meaning there as it does in § 1983. See n.6 supra.

[9]One might technically quibble that Collier did not quite catch Butler "in bed" with her daughter, but she very nearly did and the district court's point is nonetheless valid.

16

The amended complaint and Butler's briefs leave no doubt that he feels mistreated, and with what appears to be some justification. If the allegations are true, Collier's treatment of Butler was badder than old King Kong and meaner than a junkyard dog. She might even have acted like the meanest hunk of woman anybody had ever seen. Still, the fact that the mistreatment was mean does not mean that the mistreatment was under color of law. Because the alleged mistreatment of Butler was not inflicted under color of law, the district court correctly dismissed his § 1983 claims. Butler will have to seek his remedies under state law and in state court.

**AFFIRMED.**[10]

---

[10]Because we conclude that Collier did not act under color of state law, we do not address Sheriff Bradshaw's alternative arguments in support of the district court's judgment granting both defendants' motions to dismiss Butler's § 1983 claims.