[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-10391
Non-Argument Calendar
_____

D.C. Docket No. 4:19-cv-00058-CDL


SIVAN SHEREE WALKER,
SARAH N. DIXON,
DINAH D. DIXON,
CRYSTAL A. DIXON,
M.A.,
N.W.,
A.W.,
N.R.,

                                                      Plaintiffs-Appellants,


versus


ANTHONY DIXON
Individual capacity,
DONNA TENNISON,
KALEN JONES,
ANGELIQUE LUDLAM,
BOBBY CAGLE,

                                                      Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(December 7, 2020)

Before MARTIN, BRANCH, and LUCK, Circuit Judges.

PER CURIAM:

This is a tragic case about a man who physically and sexually abused his wife and children. Sivan Walker, her adult children, and her minor children sued Anthony Dixon[1] (the children's father) and four employees of the Georgia Division of Family and Children Services (Donna Tennison, Kalen Jones, Angelique Ludlam, and Bobby Cagle).[2] The Walkers brought 42 U.S.C. section 1983 claims against Dixon and the agency employees alleging violations of their Fourteenth Amendment substantive due process rights. The Walkers appeal the district court's order dismissing their complaint for failure to state a claim. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Dixon was the elections supervisor for Marion County, Georgia. His official duties included publishing election notices, overseeing elections, calculating election returns, and reporting election results. Dixon lived on a rural polygamist

---

[1] The Walkers' appeal against Dixon has been dismissed as to his official capacity but remains as to his individual capacity.

[2] We will refer to the Georgia Division of Family and Children Services as the agency and to Tennison, Jones, Ludlam, and Cagle as the agency employees.

2

compound.  One of Dixon's three wives was Walker, who he met when she was fifteen and he was thirty-two.  Walker lived with Dixon for over twenty years and they had eleven children together.

Dixon physically abused Walker and his minor children.  He also sexually abused his minor daughters over the course of several years.  Walker witnessed Dixon sexually abusing his daughters from one of his other wives three times.  The first incident occurred in 2012, the second in 2013, and the third in November 2014.  Dixon denied each time that anything inappropriate had happened and told Walker that "no one would believe her anyways."  In January 2015, Walker fled the compound with her minor children because of the ongoing abuse. Walker then went to the sheriff to report Dixon.

The agency investigated Dixon three times.  In 2010, the agency investigated an allegation that Dixon drove recklessly with minor children in the car without seatbelts.  In 2013, the agency investigated an allegation made by one of Dixon's teenage daughters to a teacher accusing Dixon of inappropriately touching her.  And in 2015, the agency investigated Walker's report that she had witnessed inappropriate behavior in 2014 between Dixon and one of his minor daughters.

The agency "screened out" the 2010 and 2013 investigations, meaning that it "peremptorily" closed them in violation of its own policies.  The agency then failed to conduct "second level review" of these screen-outs, even though this procedure

was "mandatory." As for the 2015 allegation, the agency did not interview all of Dixon's children and did not interview Walker in detail. Nor did the agency interview Dixon, who "evaded" the investigators when they arrived at his compound. Tennison, the agency's county director, later conceded this was a "pretty big mistake." Although three of Dixon's minor children gave forensic investigators graphic accounts of sexual abuse committed by Dixon, the agency closed the 2015 investigation as "unsubstantiated" despite the "ample evidence of sexual abuse." Dixon pointed to the agency's "clearance" of him as proof of his innocence. The agency later acknowledged that it "got it wrong," given the "widespread" and "systematic" evidence of Dixon's abuse.

In August 2015, Dixon filed a civil petition in state court against Walker seeking custody over their minor sons. Dixon did not seek custody over his minor daughters due to a "personal preference." After a bench trial, the state court denied Dixon's petition in October 2016 and found there was substantial evidence that Dixon physically abused his wives and sexually abused his minor daughters.

In November 2016, following the custody trial, state law enforcement opened a criminal investigation into Dixon. During the investigation, a local magistrate refused to sign a warrant for a search of Dixon's property until after Dixon had presided over an upcoming election. Dixon was ultimately charged with eleven counts of sexual and physical abuse of a child. At his first trial, the sheriff's office

4

brought Dixon to court in his jail clothes and caused a mistrial.  Dixon pleaded guilty at his second trial and is currently serving a multi-decade sentence.

The Walkers sued Dixon and the agency employees under section 1983.  As to Dixon, the Walkers alleged that he used his authority to impede the investigations into his crimes, allowing him to keep abusing the Walkers.  As to the agency employees, the Walkers alleged that the agency failed to adequately investigate Dixon and conspired with him to violate the Walkers' constitutional rights.

The agency employees moved to dismiss the Walkers' complaint for failure to state a claim.  Dixon filed an answer to the complaint from prison and denied its allegations.

The district court granted the agency employees' motion and dismissed the Walkers' complaint.  As to the section 1983 claim against Dixon, the district court concluded that the Walkers had not plausibly alleged that Dixon acted under color of state law or pursuant to his powers as the county elections supervisor when he abused them or allegedly obstructed the investigations.  The district court concluded that even if it could infer that Dixon had used his office in 2016 to coerce the magistrate into not immediately issuing the search warrant against him, this could not support a section 1983 claim because the Walkers had already fled Dixon's compound by this point and were not injured by the delay in issuing the warrant.

As to the Walkers' section 1983 claim against the agency employees, the district court concluded that the Walkers "did not suffer abuse at the hands of" the state because: (1) the agency had no affirmative obligation under the due process clause to protect them; and (2) Dixon was not a state actor when he abused his family. This was fatal to the Walkers' conspiracy allegation, the district court concluded, because "there cannot be [section] 1983 liability for such a conspiracy without an underlying violation of constitutional rights," and neither Dixon nor the agency violated the Walkers' constitutional rights.[3]

The Walkers timely appeal the district court's dismissal of their complaint.[4]

## STANDARD OF REVIEW

We review de novo the district court's dismissal of a complaint for failure to state a claim. Henley v. Payne, 945 F.3d 1320, 1326 (11th Cir. 2019). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

---

[3] The district court alternatively concluded that the agency employees were entitled to qualified immunity.

[4] The Walkers also brought federal and state RICO claims against Dixon and the agency employees, and state law claims against Dixon for battery and intentional infliction of emotion distress. The district court dismissed the federal RICO count for failure to state a claim and declined to exercise supplemental jurisdiction over the remaining state claims. The Walkers do not appeal the dismissal of the federal and state RICO counts and the other state law claims.

not do." Twombly, 550 U.S. at 555. A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Our review is therefore "two-pronged": (1) we "eliminate any allegations in the complaint that are merely legal conclusions"; and (2) for any "well-pleaded factual allegations, [we] 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting Iqbal, 556 U.S. at 679).

## DISCUSSION

The Walkers argue that their complaint plausibly alleged that: (1) Dixon acted under color of law and used his state authority to facilitate their abuse; and (2) the agency employees conspired with Dixon to violate their rights.

### *The Section 1983 Claim Against Dixon*

The Walkers argue that they plausibly alleged that Dixon acted under color of law and used his authority to facilitate their abuse. They contend that they sufficiently established Dixon's authority to impede the state abuse investigations because: (1) the agency's investigations were a "sham"; (2) the magistrate refused to immediately sign a warrant against him; and (3) the sheriff's office caused a mistrial during Dixon's first trial.

A plaintiff raising a section 1983 claim must show that "she was deprived of a federal right by a person acting under color of state law." Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001). But not all wrongful acts by state employees are acts under color of law. Almand v. DeKalb Cnty., 103 F.3d 1510, 1513 (11th Cir. 1997). Rather, section 1983 seeks to prevent misuses of power "made possible only because the wrongdoer is clothed with the authority of state law[.]" Butler v. Sheriff of Palm Beach Cnty., 685 F.3d 1261, 1268 (11th Cir. 2012) (citation omitted); Griffin, 261 F.3d at 1303 (a person "acts under color of state law when he acts with authority possessed by virtue of his employment with the state."). The question is whether the government employee has "abuse[d] the position given to him" by the state, id., or instead "act[ed] only as a private individual," Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1523 (11th Cir. 1995). As the Supreme Court has explained, "'acts of officers in the ambit of their personal pursuits are plainly excluded' from being under color of law[.]" Butler, 685 F.3d at 1266 (quoting Screws v. United States, 325 U.S. 91, 111 (1945)).

The Walkers generally alleged in their complaint that Dixon victimized them through his "political" and "governmental authority," and used the power of his office and "influence under state law" to "immunize himself from investigation, arrest, and prosecution." These allegations are legal conclusions "couched" as factual allegations, which we are not bound to accept as true. See Twombly, 550

8

U.S. at 555. We must therefore "eliminate" them and turn to the factual allegations in the Walkers' complaint. See Am. Dental Ass'n, 605 F.3d at 1290.

As for the specific acts the Walkers attributed to Dixon, they were not enough to suggest that he acted under color of law to facilitate his crimes. First, the Walkers alleged that the agency failed to properly investigate Dixon because of "political considerations" caused by "Dixon's power and personal relationship with" the agency. The preexisting relationship between Dixon and the agency, according to the Walkers, "could" have compromised the investigators' objectivity. But these "speculative" could-have allegations do not plausibly suggest that Dixon exercised his official power or authority as the county elections supervisor to thwart the agency's investigations. See Twombly, 550 U.S. at 555.

Second, the Walkers alleged that other officials besides the agency were uncooperative with Dixon's investigation and prosecution. They gave two examples of Dixon's "cooperative relationship with and influence over" local officials: (1) a magistrate refused to sign a warrant for the search of Dixon's property until after Dixon presided over an election; and (2) the sheriff's office brought Dixon to his trial in jail clothes and caused a mistrial. But, as the district court explained, both incidents occurred after the Walkers had fled Dixon's compound. Thus, neither allegation plausibly suggested that Dixon acted under color of law to facilitate his prior crimes against his family. Although the Walkers argue that these incidents—

9

viewed in the light most favorable to them—reflect Dixon's ability to obstruct investigations through his official status, it remains "speculative" that Dixon had previously used his authority to impede any investigation when the Walkers lived with him.

The Walkers' allegations are similar to those where we held that state employees did not act under color of law. In Almand, a police officer did not act under color of law when he broke into a woman's apartment and raped her because his forcible entry had "no bearing" on "his status as a police officer." 103 F.3d at 1515. Once the officer "resorted to sheer force" to enter the apartment, we explained, "he was no different from any other ruffian." Id. And in Butler, a corrections officer did not act under color of law when she came home early from work in uniform, found her daughter's beau hiding naked in a closet, handcuffed him, and held him at gunpoint with her service weapon. 685 F.3d at 1263, 1267. This officer was not "exercising her authority" or abusing her law enforcement position in doing so; she was simply "acting as an enraged parent." Id. at 1267.

As in Almand and Butler, Dixon's "conduct, or misconduct, was not accomplished because of" his official status. See id. His abuse of the Walkers was not "made possible only" because of his authority as the county elections supervisor to publish election notices, calculate election returns, or report election results. See id. at 1268. Nor did the Walkers plausibly allege that Dixon used his authority to

10

"create the opportunity" to abuse them or conceal the abuse. See Griffin, 261 F.3d at 1303–04 (holding that city manager acted under color of law when he used his authority "to create the opportunity to be alone with" the plaintiff following a private function, "to take her home, and then to rape her."). When Dixon harmed his wives and children behind the closed doors of his polygamist compound, "he was no different from any other" abuser who preys upon his own family. See Almand, 103 F.3d at 1515. Because the Walkers did not plausibly allege that Dixon's official position had any bearing on his reprehensible actions, the district court did not err in dismissing their section 1983 claim against him.

*The Section 1983 Claim Against the Agency Employees*

The Walkers argue that they plausibly alleged that the agency employees conspired with Dixon to permit his continued abuse or to protect him from investigation. This established a section 1983 substantive due process claim against the agency employees, the Walkers argue, because conspiring to violate a person's constitutional rights violates section 1983. The Walkers maintain that they alleged sufficient circumstantial proof of a conspiracy because Dixon had a preexisting relationship with Tennison, the agency's county director, and her office deviated from mandatory policies when it investigated Dixon.

"Conspiring to violate another person's constitutional rights violates section 1983." Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1283 (11th Cir. 2002). But

11

the conspiracy must "result[] in the actual denial of some underlying constitutional right." Grider v. City of Auburn, 618 F.3d 1240, 1260 (11th Cir. 2010). Because "the conspiratorial acts must impinge upon [a] federal right," a plaintiff "must prove an actionable wrong to support the conspiracy." Bendiburg v. Dempsey, 909 F.2d 463, 468 (11th Cir. 1990) (citations omitted).

The Walkers failed to plausibly allege that Dixon violated their constitutional rights. As discussed above, there is nothing more than speculation that Dixon acted under color of law when he abused the Walkers. See Almand, 103 F.3d at 1515. Thus, Dixon's actions cannot establish the denial of a constitutional right necessary for the Walkers' section 1983 conspiracy claim against the agency employees. See Grider, 618 F.3d at 1260.

The Walkers likewise failed to plausibly allege that the agency employees violated their constitutional rights. In DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 195 (1989), the Supreme Court observed that "nothing in the language" of the due process clause "requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." This constitutional provision is instead "a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." Id. Thus, as a "general matter," a state's "failure to protect an individual against private violence simply does not constitute" a substantive due process violation. Id. at 197.

12

No one disputes that the agency's 2015 investigation into Dixon was woefully inadequate. But that investigation occurred after the Walkers had fled Dixon's compound and therefore did not cause or contribute to their injuries. As for the 2010 investigation, it only involved an allegation that Dixon drove recklessly with his children in the car. It did not involve allegations of sexual abuse. That just leaves the agency's 2013 investigation, which involved an allegation that Dixon had inappropriately touched one of his teenage daughters. "[T]hough calamitous in hindsight," the agency's failure to properly investigate this case and uncover Dixon's abuse in 2013 was not a substantive due process violation. See id. at 202.

The Walkers maintain that DeShaney does not control for two reasons. First, the Walkers argue that the agency employees, on top of being negligent, "knowingly conspired with Dixon to protect him from investigation or facilitate his continued abuse." But the Walkers did not plausibly allege that Dixon and the agency had an agreement to violate their rights. See Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., 956 F.2d 1112, 1122 (11th Cir. 1992) ("[T]he linchpin for conspiracy is agreement."). The Walkers merely alleged that the agency failed to adequately investigate Dixon, which "could" have been caused by his "pre-existing relationship" with the agency. These speculative allegations, without more, are not enough to plausibly "suggest [a] conspiracy." See Twombly, 550 U.S. at 557.

13

Second, the Walkers argue that the agency employees' conduct independently violated their due process rights because it was "arbitrary or conscience shocking in the constitutional sense." White v. Lemacks, 183 F.3d 1253, 1257 (11th Cir. 1999). But "only the most egregious official conduct" rises to this level. Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) (citation and quotation marks omitted). This standard "is to be narrowly interpreted and applied," White, 183 F.3d at 1259, such that "even intentional wrongs seldom violate" due process, Waddell v. Hendry Cnty. Sheriff's Office, 329 F.3d 1300, 1305 (11th Cir. 2003).

The Walkers did not plausibly allege that the agency's conduct met this demanding standard. The 2010 investigation dealt only with Dixon's reckless driving. The 2015 investigation, while inadequate, occurred after the Walkers' abuse had ended. And as for the 2013 investigation, a single negligent investigation is not "the most egregious official conduct" that shocks the conscience and violates substantive due process. See Lewis, 523 U.S. at 846 (holding that a highspeed chase where a police officer ran over and killed the passenger on a fleeing motorcycle did not violate substantive due process); DeShaney, 489 U.S. at 198 (holding that negligence by a county social services department which left a child permanently brain damaged by his abusive father did not shock the conscience); Nix v. Franklin Cnty. Sch. Dist., 311 F.3d 1373, 1377–79 (11th Cir. 2002) (rejecting a substantive

14

due process claim against a teacher where a classroom demonstration with a live wire electrocuted a student to death).

In sum, the Walkers did not plausibly allege that the agency employees conspired with Dixon to violate their constitutional rights or independently violated their substantive due process rights. We therefore affirm the district court's order dismissing the Walkers' section 1983 claim against the agency employees.[5]

**AFFIRMED.**

---

[5] Because the Walkers did not state a plausible claim for relief against the agency employees, we need not decide whether these defendants were entitled to qualified immunity.

15