[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-14802
_____

D.C. Docket No. 1:09-cv-00155-JRH-WLB


DUSTIN MYERS,
RODNEY MYERS,

                                                                Plaintiffs–Appellants,


versus


MURRY BOWMAN,
Individually, and as the Chief Magistrate
of Jefferson County, Georgia,
WILEY CLARK EVANS, IV,
Individually, and as a Deputy Sheriff with
the Jefferson County Sheriff's Department,
CHARLES HUTCHINS,
Individually, and as the Sheriff of the
Jefferson County Sheriff's Department,

                                                                Defendants–Appellees,


JAMES W. MILLER, JR.,
Individually, and as a Chief of Police
of the City of Louisville, Georgia,
JEFFERSON COUNTY, GEORGIA,
THE CITY OF LOUISVILLE, GEORGIA,

                                                                Defendants.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(April 10, 2013)

Before MARCUS and PRYOR, Circuit Judges, and FRIEDMAN,[*] District Judge.

PRYOR, Circuit Judge:

This appeal presents the question whether three officials in a rural county of Georgia are entitled to a summary judgment against a complaint that they violated the civil rights of a father and son who had been involved in an aborted exchange of property between a previously engaged couple. When Dustin Myers and Kelley Bowman ended their engagement to be married, Dustin attempted to retrieve the diamond ring he had given Kelley and other personal property, but that attempt prompted allegations that Dustin had stolen Kelley's dog, followed by a police chase on rural roadways and a brief arrest of Dustin and his father, Rodney Myers. The end of the police chase, which resembles a scene from a rerun of the 1980s television show, The Dukes of Hazzard, fittingly was captured on a video camera on the dashboard of a police car. The Myers filed a complaint that Murry Bowman, who is Kelley's father and the magistrate judge of Jefferson County, Georgia; Wiley Clark Evans, a deputy sheriff who arrested the Myers; and Charles

---

[*] Honorable Paul L. Friedman, United States District Judge for the District of Columbia, sitting by designation.

2

Hutchins, who was Evans's supervisor, all conspired to violate and violated the Myers' rights under the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983. After our review of the videotape and other evidence, we agree with the district court that the Myers' effort to make a federal case out of these events fails: Murry and Evans did not subject the Myers to excessive force; Evans had probable cause to arrest the Myers; Murry did not act under color of law; and the Myers failed to present any evidence that Murry, Evans, and Hutchins conspired to commit a false arrest. We affirm the summary judgment against the Myers' complaint.

## I.    BACKGROUND

There would be no wedding bells, no wedding cake, and no tuxedo and white dress for Dustin Myers and Kelley Bowman. The couple was engaged to be married, but before the time came to say "I Do," Kelley found herself a new Romeo. She broke Dustin's heart, and she tried to hurt his finances too by hosting two yard sales at which she sold some of his property. Kelley's mother called Dustin late in the evening of August 12, 2009, to tell him that his fiancée had been unfaithful and to provide the helpful advice that he should "come get [his] stuff before everything was gone."

Dustin and his father, Rodney Myers, left their home at about 3:00 a.m. the next day to begin a journey from Rodney's home in Lenox, Georgia, to Murry Bowman's home in Louisville, Georgia. The Myers arrived at the Bowman home

at about 7:00 a.m. and demanded that Kelley return Dustin's property, including the engagement ring that he had given to his former bride-to-be. Kelley gave Dustin some of his property, including clothing, a television, and a computer, but she alleged that she had lost the engagement ring.

While the Myers packed their truck, the couple's pet dog, a Maltese named Lexi, jumped into the truck. Dustin and Rodney had purchased the dog, but both Dustin and Kelley had cared for the dog, and the dog had been living with the Bowmans. The Myers departed the Bowman home with Lexi, but without the engagement ring.

Although Kelley could no longer bear Dustin, she wanted Lexi to remain in her life. Murry, who was the magistrate judge of Jefferson County, called Dustin and requested that he return Lexi to his daughter. Dustin agreed to return the dog in exchange for the engagement ring and some money that he said Kelley owed him.

Later that morning, Murry and Kelley found the Myers at a local bank, where Dustin had closed the joint checking account that he and Kelley had shared. Murry pulled his truck alongside the Myers' truck, exited his vehicle, approached the Myers' truck wearing the engagement ring on his pinkie finger, tossed the ring through the window of the truck and into Dustin's lap, and said, "Here, I've got your goddamn ring." But Murry did not give the money to Dustin because, he

4

explained, "I don't have that kind of money just to give to you right now."  After the Bowmans failed to uphold their end of the bargain, the Myers drove away with both the diamond ring and the dog.  As Dustin drove away, Murry shouted into the distance, "I'll have your goddamn ass locked up."  Murry returned to his truck and began to follow the Myers.

What began as a catty dispute escalated into a tempest after Murry reported to the police that someone had stolen his dog.  Jefferson County had provided Murry with a SouthernLINC communications device to use for his official duties, and Murry used that device to contact Anita Thompson, who was a deputy clerk in his office, and to instruct her to report to the police that someone had stolen his dog, which he said was worth $700.  Georgia then classified as a felony a theft of property worth more than $500.  See Ga. Code Ann. § 16–8–12(a)(1) (repealed 2012).  Murry testified that he does not recall whether he told Thompson that the Myers were the alleged thieves.  Although the Myers allege that Murry did not attempt to contact the police before he contacted Thompson, Murry testified that he did not recall whether he attempted to contact the police first.

Thompson relayed Murry's complaint to two on-duty law enforcement officers: Wiley Clark Evans, who was a deputy sheriff for Jefferson County, and James W. Miller Jr., who was the chief of police for the City of Louisville.  Thompson contacted them on their SouthernLINC devices, and she told them that

two men had stolen Murry's dog, which she said was worth $700; that the men had fled the scene in a truck; and that Murry was following them in his own vehicle. Thompson also gave the officers a description of the Myers' truck and the direction in which it was travelling. But Thompson did not tell the officers that the alleged thieves were Dustin and Rodney or that the alleged theft occurred in connection with a dispute between the Bowmans and the Myers about a failed engagement. Thompson then remained in regular contact with Evans and Miller, and she directed their pursuit of the Myers based on information that she received from Murry. During the pursuit of the Myers, Murry did not communicate directly with either Evans or Miller.

Jefferson County requires its law enforcement personnel to report incidents to a 9-1-1 dispatcher and to communicate with other officers through recorded police radio, but Murry, Thompson, Evans, and Miller communicated with each other using the unrecorded SouthernLINC communications system. The SouthernLINC system serves as a backup communications system when the radio communications system malfunctions. Jefferson County provided Murry and Thompson with their SouthernLINC devices, but both Evans and Miller purchased their devices. Evans testified that crime victims sometimes reported crimes directly to him on his SouthernLINC device or cellular phone in lieu of contacting 9-1-1.

6

Miller pursued the Myers beyond the city limits of Louisville. Miller testified that he sometimes pursues criminals outside of his jurisdiction and that his decision whether to do so depends upon several circumstances, including the severity of the crime and whether it was committed within the city limits of Louisville. Miller testified that he pursued the Myers outside of his jurisdiction because he received a report that a felony theft might have occurred within his jurisdiction and the report came from the office of a magistrate.

The Myers drove toward Rodney's home, and both Murry and Miller followed the Myers for several miles. Dustin testified that he knew that Murry was following him and that he received a phone call from a friend who told him that the police were searching for him. Shortly after the caravan rounded "dead man's curve," Evans approached the vehicles from the opposite direction and used his patrol vehicle to block the road, and the Myers brought their truck to a stop.

Evans and Miller arrested the Myers. The arrest was recorded by a video camera in Evans's vehicle, and the recording establishes that the detention lasted about eight minutes. Although Jefferson County requires its officers to create both video and audio recordings of their arrests, no audio recording exists of the arrest. Evans testified that he had been charging his audio recorder at the time of the arrest and that he forgot to hook up the audio recorder before he exited his vehicle to apprehend the Myers.

Dustin brought his truck to a stop, and both he and his father remained inside their vehicle.  Evans exited his patrol vehicle and approached the Myers' truck with his gun pointed at Dustin.  Evans instructed Dustin to place his hands outside of the truck so that Evans would see that he was unarmed, and Dustin complied with that instruction.  Murry also brought his vehicle to a stop, and he exited his vehicle and walked towards the Myers' truck.  Murry then instructed Evans to get Dustin out of the truck.

In a series of swift motions, Evans holstered his gun, reached through the open window of the truck, placed the truck in park, opened the driver-side door, grabbed Dustin by his left arm, pulled him out of the truck, and wrestled him to the ground.  While Dustin lay on the ground, Evans placed him in handcuffs and rolled him over while he searched him for weapons.  Dustin did not resist.  Dustin suffered injuries to his head, left wrist, left forearm, neck, and knees as a result of Evans's use of force.

While Evans arrested Dustin, Miller arrived on the scene and approached the passenger-side door of the truck to remove Rodney from the cabin.  Miller ordered Rodney to exit the truck and place his hands against the side of the vehicle.  Miller pointed his gun at Rodney for about fifteen seconds, and he threatened to shoot Rodney if he did not comply with his instructions.  Rodney exited the truck and

complied with Miller's instructions.  Rodney does not allege that he suffered any physical injuries as a result of the arrest.

While Evans and Miller arrested the Myers, Murry entered the cabin of the Myers' truck, retrieved Lexi, and placed the dog inside his own vehicle.  Evans brought Dustin to his feet, but he did not release him from the handcuffs.  Murry then berated Dustin and Rodney for several minutes.  Murry threatened him by saying "that this was his goddamn county and [he] wanted to know who the fuck [Dustin] was coming up there in his fucking county acting like that."  Evans also badgered Dustin and said to him, "[h]e's the fucking magistrate judge up here. Who the fuck you think you messing with?"

After about seven minutes, Murry instructed Evans and Miller to release the Myers.  After Evans released Dustin from the handcuffs, Murry threated Dustin once more.  As if in homage to Stephen the Irishman, the character in Braveheart who declared his native Ireland to be "My Island!" Murry said to his former future-son-in-law, "Once again, this is my county.  I don't want to ever see you back up here. . . . I'm fixing to let you go.  You get your shit, and I better not fucking catch you back in my county."  The Myers returned to their truck and drove away.  Lexi stayed behind inside Murry's truck.

Evans later completed an incident report. Jefferson County prohibits the same officer from acting as both the reporting officer and reviewing officer of an

9

incident report, but Evans nonetheless served in both capacities. Evans wrote in the report that he learned at the scene of the arrest about the failed ring-for-dog exchange between the Myers and the Bowmans, but he later admitted in testimony that he learned about some of those details after the arrest in a telephone call with Kelley.

Dustin and Rodney filed a complaint in the district court against Murry, Evans, Miller, Jefferson County Sheriff Charles Hutchins, the City of Louisville, and Jefferson County. The Myers alleged that Murry, Evans, and Miller violated their rights under the Fourth and Fourteenth Amendments to be free from unreasonable seizures and excessive force, 42 U.S.C. § 1983, and that Hutchins failed to supervise and train Evans, id. The Myers alleged that the defendants conspired to violate their constitutional rights, id. §§ 1983, 1985. They alleged that the City of Louisville and Jefferson County had official policies or customs that caused the violation of their Fourth and Fourteenth Amendment rights, id. § 1983; see Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 2037–38 (1978). Finally, they asserted state law claims against the defendants, including claims for false imprisonment, assault, battery, and intentional infliction of emotional distress. The Myers later conceded that Jefferson County was entitled to a summary judgment.

The district court entered a summary judgment in favor of the defendants on the federal claims and declined to exercise supplemental jurisdiction over the state claims. The district court concluded that Evans and Miller had probable cause to arrest the Myers and the force they used was not clearly unwarranted under the circumstances. The district court concluded that Murry did not cause a false arrest or instruct Evans and Miller to use excessive force. And the district court concluded that the Myers presented insufficient evidence of a conspiracy or that Hutchins or the City of Louisville violated the rights of the Myers.

## II.    STANDARD OF REVIEW

"We review a district court's grant or denial of a motion for summary judgment de novo." Harris v. Bd. of Educ. of Atlanta, 105 F.3d 591, 595 (11th Cir. 1997).

## III.    DISCUSSION

We divide our discussion in four parts. First, we discuss why Evans is entitled to a summary judgment against the claims of false arrest and excessive force. Second, we discuss why Hutchins is entitled to a summary judgment against the claim for supervisory liability. Third, we discuss why Murry is entitled to a summary judgment against the claims for false arrest and excessive force. Fourth, we discuss why Murry and Evans are entitled to a summary judgment against the claims for conspiracy to commit false arrest and conspiracy to use excessive force.

11

### A. *Evans Did Not Violate the Constitutional Rights of the Myers.*

The record establishes that Evans did not violate the Myers' civil rights. Evans had probable cause to arrest the Myers, and he did not use excessive force against them.

### 1. Evans Had Probable Cause to Arrest the Myers.

The record, viewed in the light most favorable to the Myers, establishes that Evans had probable cause to arrest the Myers. "The existence of probable cause at the time of arrest [ ] constitutes an absolute bar to a section 1983 action for false arrest." Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004). "Probable cause to arrest exists when an arrest is objectively reasonable based on the totality of the circumstances." Id. "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Id. (quoting Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998) (internal quotation marks omitted)). "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," and even "seemingly innocent activity" can provide the basis for probable cause. Illinois v. Gates, 462 U.S. 213, 243 n.13, 103 S. Ct. 2317, 2335 n.13 (1983). When Evans arrested the Myers, he had reason to believe that they

12

had committed a felony theft and fled the scene of the crime.  Evans's knowledge was based on the criminal complaint of Murry and Thompson, and "[g]enerally, an officer is entitled to rely on a victim's criminal complaint as support for probable cause."  Rankin, 133 F.3d at 1441.  Evans was entitled to presume that Murry and Thompson were particularly reliable and trustworthy sources because they were government officials.  And the record does not establish any circumstances known to Evans that would negate the existence of probable cause.

The Myers argue that a reasonable juror could infer that Murry and Evans engaged in secret communications during which Murry told Evans to arrest the Myers even though they had committed no crime.  The Myers argue that a reasonable juror could draw this inference because of the "sinister circumstance[ ]" that the defendants communicated over the unrecorded SouthernLINC communications system, Evans failed to produce an audio recording of the arrest, and the videotape of the arrest suggests that Evans acted at the direction of Murry.  We disagree.

The Myers' argument is based upon speculation and conclusory allegations, and "[t]his court has consistently held that conclusory allegations without specific supporting facts have no probative value."  Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985).  Evans testified that Thompson told him only that someone had stolen the Bowman dog and that she did not tell him the identity of

13

the alleged thieves or that the theft occurred after a dispute between the Bowmans and the Myers. Both Murry and Evans testified that they did not communicate directly with each other, and the Myers have not introduced any evidence to the contrary or evidence that Murry instructed Evans to arrest the Myers with knowledge that they had committed no crime. Although Jefferson County had a policy that required law enforcement personnel to report crimes through the recorded radio, the SouthernLINC system was sometimes used because the radio communications system was unreliable. And Evans testified that citizens sometimes reported crimes directly to him on his SouthernLINC device or his cellular phone. A reasonable juror could not find that, because Murry, Thompson, and Evans communicated over an unrecorded communications system, they agreed wrongfully to arrest two innocent people. Nor does the video of the arrest suggest that Evans lacked probable cause to arrest the Myers. Neither that Murry instructed Evans to remove Dustin from the truck, nor that Murry took Lexi from the truck, permits the inference that Evans lacked probable cause to arrest the Myers. Evans is entitled to a summary judgment against the claim for false arrest.

2. Evans Did Not Use Excessive Force Against Dustin Myers.

The force Evans used against Dustin was not excessive. "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest."

14

Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002). "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871–72 (1989). "This circuit has made clear that some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense." Durruthy v. Pastor, 351 F.3d 1080, 1094 (11th Cir. 2003). Because a police officer is entitled to use some force to arrest a suspect, "the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000). The record contains a videotape of the arrest, so we are able to determine whether Evans used excessive force "in the light depicted by the videotape." See Scott v. Harris, 550 U.S. 372, 381, 127 S. Ct. 1769, 1776 (2007). The videotape shows that Evans grabbed Dustin by the arm, forced him to the ground, placed him in handcuffs, and searched him. Evans held Dustin to the ground for less than one minute before he helped Dustin to his feet. Evans released Dustin from his handcuffs about six minutes later. Evans used this force at a time when he had probable cause to arrest Dustin. And when the arrest occurred, Evans could not have known whether Dustin was armed or whether he would resist arrest. After he handcuffed and searched Dustin, Evans did not use

15

any additional force against him.  The videotape establishes that the force Evans used was de minimis and lawful.

The force used by Evans was no more severe than the force that we have described as de minimis and lawful in other cases.  For example, in Durruthy, the plaintiff brought a claim of excessive force against a police officer who "force[d] [the plaintiff] down to the ground and plac[ed] him in handcuffs," and we reversed a denial of the defense of qualified immunity because we concluded that the officer used only de minimis force to arrest the plaintiff.  351 F.3d at 1094.  Evans used a nearly identical amount of force as the defendant used in Durruthy.  And in Nolin, the plaintiff filed a claim of excessive force against a police officer who, in the course of breaking up a fight and with probable cause to arrest the plaintiff, "grabbed [the plaintiff] from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him."  207 F.3d at 1255.  We reversed a denial of a summary judgment in favor of the police officer on the ground that the officer's use of force "falls well within the ambit of the de minimis force principle."  Id. at 1258 n.4.  But Evans used even less force against Dustin than the defendant in Nolin used against his arrestee, and the Myers do not argue that Evans used any force against Rodney.

16

The Myers contend that a genuine issue of material fact barred a summary judgment because their expert testified that the force used by Evans was excessive, but whether the force that Evans used was excessive is a "pure question of law." See Scott, 550 U.S. at 381 n.8, 127 S. Ct. at 1776 n.8. That question "is not a matter subject to expert testimony." See Freund v. Butterworth, 165 F.3d 839, 863 n.34 (11th Cir. 1999) (en banc) (stating that whether a law firm rendered ineffective assistance of counsel under a given set of facts is a question of law that is not subject to expert testimony).

### B. Hutchins Is Entitled to a Summary Judgment Because Evans Did Not Commit an Underlying Violation of the Myers' Civil Rights.

Because Evans did not violate the Myers' civil rights, the supervisory liability claim against Hutchins fails too. "[S]upervisors are liable under [section] 1983 'either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation.'" Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010) (quoting Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003)). But a supervisor may not be held liable under section 1983 unless the supervised official committed an underlying violation of a constitutional right. See Case v. Eslinger, 555 F.3d 1317, 1328 (11th Cir. 2009) (affirming a summary judgment in favor of a defendant supervising officer on a claim under section 1983 because the plaintiff failed to establish that the

17

supervised arresting officer violated the constitutional rights of the plaintiff). Because Evans did not violate the constitutional rights of the Myers, Hutchins could not have participated in or caused the violation of the constitutional rights of the Myers, and he is entitled to a summary judgment in his favor.

### C. Murry Is Entitled to a Summary Judgment Because the Officers Did Not Use Excessive Force and Murry Did Not Act Under Color of Law.

The Myers' claims against Murry fall into two categories: first, the Myers contend that Murry caused them to suffer excessive force; and second, the Myers argue that Murry manufactured a false basis for probable cause to arrest them. Both claims fail.

First, Murry is entitled to a summary judgment against the claim that he caused the Myers to suffer excessive force because neither Evans nor Miller used excessive force against the Myers. The Myers had to establish that Murry's conduct caused them to be "deprived . . . of rights, privileges, or immunities secured by the Constitution or laws of the United States." Beaulieu v. City of Alabaster, 454 F.3d 1219, 1225 (11th Cir. 2006). But Evans did not use excessive force against Dustin, and neither Evans nor Miller used physical force against Rodney. Because the Myers cannot establish that police subjected them to excessive force, they cannot establish that Murry caused them to be subjected to excessive force.

Second, Murry is entitled to a summary judgment against the claim that he caused a false arrest because Murry did not act under color of law when he reported the theft of the dog. Although Murry instructed Evans to remove Dustin from the truck, that instruction did not cause Dustin's arrest because Murry gave the instruction after Evans was already in the process of arresting Dustin. Murry's conduct after the chase deserves condemnation, but his potential liability should be determined, if at all, by state tort law. "Section 1983 does not federalize all torts or other deprivations of rights committed by a person who is a law enforcement officer or other government agent." Butler v. Sheriff of Palm Beach Cnty., 685 F.3d 1261, 1265 (11th Cir. 2012). Section 1983 instead punishes only actions committed "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. "A successful section 1983 action requires that the plaintiff show [he] was deprived of a federal right by a person acting under color of state law." Almand v. DeKalb Cnty., Ga., 103 F.3d 1510, 1513 (11th Cir. 1997). The record establishes that Murry acted as a private citizen, not under color of law.

"Not all acts by state employees are acts under color of law," id.; see Polk Cnty. v. Dodson, 454 U.S. 312, 319–20, 102 S. Ct. 445, 450–51 (1981), and "acts of officers in the ambit of their personal pursuits" are not done under color of law, Screws v. United States, 325 U.S. 91, 111, 65 S. Ct. 1031, 1040 (1945). "The

19

traditional definition of acting under color of state law requires that the defendant in a [section] 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. 42, 49, 108 S. Ct. 2250, 2255 (1988) (quoting United States v. Classic, 313 U.S. 299, 326, 61 S. Ct. 1031, 1043 (1941)). "A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state," Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001), or when "the manner of his conduct . . . makes clear that he was asserting the authority granted him and not acting in the role of a private person," Williams v. United States, 341 U.S. 97, 100, 71 S. Ct. 576, 578 (1951). "The dispositive issue is whether the official was acting pursuant to the power he/she possessed by state authority or acting only as a private individual." Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1523 (11th Cir. 1995).

Our precedents in Almand and Butler illustrate that an officer cannot be held liable for a constitutional tort when he acts in a private capacity. We held in Almand that a police officer did not act under color of law when he raped a woman, even though the police officer became acquainted with the woman only because he was the investigator of a crime that she had reported to the police. 103 F.3d at 1514–15. Although the officer in Almand initially gained access to the victim's apartment to question her about her criminal complaint, the officer then

20

left the apartment and the victim closed the door before the officer forcibly reentered the apartment and raped the victim.  Id.  We explained that, when the officer "reentered the apartment by forcibly breaking in, he was no different from any other ruffian" and did not act under color of law.  Id. at 1515.  Butler concerned a mother who arrived home from work one day to discover her daughter disrobed in bed and a naked young man hiding in a closet.  685 F.3d at 1263. When the mother, who worked as a county corrections officer, discovered the young man in the closet, she handcuffed him, placed him on his knees for a prolonged period, held him at gunpoint, and threatened to kill him.  Id. at 1263–64. We held that, when the mother assaulted the young man, she did not act under color of law.  Id. at 1267.  We explained that, although the mother used the gun and handcuffs that she wore as a corrections officer, her actions were not under color of law because adults may lawfully possess firearms and handcuffs, and "there [was] no reason to believe that [the corrections officer] would not have done, or been able to do, what she did to [the young man] without her handcuffs." Id. at 1267–68.

Murry did not act under color of law when he reported to police that someone had stolen his dog because, in reporting the crime, he "act[ed] only as a private individual," Edwards, 49 F.3d at 1523, and not "in his official capacity or while exercising his responsibilities pursuant to state law," West, 487 U.S. at 50,

21

108 S. Ct. at 2255. The theft occurred in connection with a private dispute and not a matter that was before Murry in his official capacity as a magistrate judge, and Murry alleged a theft of private property, not any property that belonged to the government. See Delcambre v. Delcambre, 635 F.2d 407, 408 (5th Cir. 1981) (holding that a police officer did not act under color of law when he assaulted his sister-in-law in part because "the altercation arose out of an argument over family and political matters").

The Myers argue that Murry acted under color of law because he reported the theft using his government-issued SouthernLINC communications system, but we disagree. In Butler, we held that the corrections official did not act under color of law even though she used the gun and handcuffs she carried while on duty. 685 F.3d at 1267. Likewise, Murry did not act under color of law because he used the SouthernLINC communications device. And the SouthernLINC system was not a proprietary technology of the government. Any citizen could have purchased the technology, and Evans testified that ordinary citizens sometimes reported crimes directly to police officers using a SouthernLINC device or cellular phone instead of by calling a police dispatcher. And if Murry did not have a SouthernLINC device, he could have reported the crime using a cellular phone or other device. Thus "there is no reason to believe that [Murry] would not have done, or been able to do, what [he] did to [the Myers]" without the use of his SouthernLINC radio,

22

and we must conclude that Murry did not act under color of law. See id. at 1267–68; see also Brown v. Miller, 631 F.2d 408, 411 (5th Cir. 1980) (holding that a defendant mayor acted under color of law when he seized the plaintiff's paycheck in part because "[t]he mayor had access to the town paycheck book solely because he held the office of mayor").

The Myers also argue that Murry acted under color of law because Miller would not have pursued the Myers outside of his jurisdiction unless he received the instruction from a government official, but this argument fails too. "[T]he primary focus of the color of law analysis must be on the conduct of the [defendant]," not the victim or a third-party, Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 47 (1st Cir. 1999), and the record does not support the conclusion that Murry "act[ed] pursuant to the power [he] possessed by state authority," see Edwards, 49 F.3d at 1523. Nor was the arrest "made possible only because [Murry] [wa]s clothed with the authority of state law." West, 487 U.S. at 49, 108 S. Ct. at 2255 (quoting Classic, 313 U.S. at 326, 61 S. Ct. at 1043). Although Murry's position as a magistrate judge affected Miller's decision to pursue the Myers, Evans acted at all times within his jurisdiction, and it was Evans who caused the Myers to stop their vehicle. Evans would have arrested the Myers even if Miller had stopped his vehicle at the city limits.

23

Although Murry instructed Evans to remove Dustin from the vehicle, the record establishes that Evans would have made the arrest even if Murry had not been present at the scene or directed Evans to remove Dustin from the vehicle. Evans had probable cause to arrest the Myers for a felony theft, and Evans approached the truck with his gun drawn and directed Dustin to place his hands outside the vehicle before Murry gave any direction to Evans. By the time Murry instructed Evans to remove Dustin from the vehicle, Evans was already in the process of arresting Dustin. Murry therefore did not invoke his authority as a magistrate judge to cause the arrest of Dustin.

Although Murry invoked his authority as a magistrate judge when he threatened Dustin at the scene of the arrest, that threat occurred after police arrested the Myers and fails to create a reasonable inference that Murry acted under color of law when he reported the theft of the dog. Compare Griffin, 261 F.3d at 1304 (holding that a reasonable juror could find that the defendant town manager acted under color of law when he raped the plaintiff because the defendant "invoked his authority as City Manager to create the opportunity to be alone with [the plaintiff], to take her home, and then to rape her"). Murry is entitled to a summary judgment against the claim for false arrest because he did not act under color of law.

24

*D. Murry, Evans, and Hutchins Are Entitled to a Summary Judgment Against the Conspiracy Claim Because the Myers Did Not Suffer Excessive Force and For Lack of Evidence.*

The Myers claim that Murry, Evans, and Hutchins conspired to cause them to suffer excessive force and unlawful arrest. Both claims fail. We address each in turn.

First, Murry, Evans, and Hutchins are entitled to a summary judgment against the claim that they conspired to use excessive force because the Myers were not subject to excessive force. "To sustain a conspiracy action under [section] 1983[,] a plaintiff must show an underlying actual denial of his constitutional rights." Hadley v. Gutierrez, 526 F.3d 1324, 1332 (11th Cir. 2008) (alterations omitted). Because the Myers did not suffer excessive force, the Myers cannot establish an underlying denial of their constitutional right to be free from excessive force.

Second, Murry, Evans, and Hutchins are entitled to a summary judgment against the claim that they conspired to commit a false arrest because the Myers failed to introduce evidence that the officials entered a conspiracy. To sustain a conspiracy action under section 1983, "the plaintiff must prove that the defendants reached an understanding to deny the plaintiff's rights." Id. The Myers failed to introduce evidence that Murry, Evans, and Hutchins reached an understanding to commit a false arrest. The Myers argue that a reasonable juror could find that

25

Murry, Evans, and Hutchins reached an agreement to violate their constitutional rights because Murry and Evans engaged in unrecorded conversations. But the Myers offer no affidavits, testimony, or other evidence to support a reasonable inference that Murry and Evans communicated directly with each other or plotted to violate the rights of the Myers. "Although an agreement may be inferred 'from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct,' . . . the [Myers] have failed to bring forward any evidence of the defendants' conduct from which a reasonable fact-finder could make such an inference." See Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami, Fla., 637 F.3d 1178, 1192 (11th Cir. 2011) (quoting United States v. Schwartz, 541 F.3d 1331, 1361 (11th Cir. 2008)). Although Evans did not object when Murry took Lexi from Dustin's truck at the scene of the arrest, that silence does not support the inference that Murry, Evans, and Hutchins conspired to violate the rights of the Myers. And although Evans did not produce an audio recording of the arrest, he produced a video recording, and he provided an explanation for why he did not produce an audio recording. The Myers' "conclusory allegations without specific supporting facts" are insufficient, standing alone, to overcome a motion for summary judgment. Evers, 770 F.2d at 986.

## IV.    CONCLUSION

We **AFFIRM** the summary judgment against the Myers' complaint.