[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11872
Non-Argument Calendar
_____

D.C. Docket No. 4:12-cv-00182-WS-CAS

JOSEPH BENJAMIN WILLIS,

Plaintiff–Appellant,

versus

MIKE MOCK, in his official capacity,
CITY OF APALACHICOLA, a municipal corporation,
RANDALL COOK, in his individual capacity,
LAWRENCE BRANNON, in his individual capacity,
STEVE JAMES, in his individual capacity, and
CHET TURNER, in his individual capacity,

Defendants–Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(January 27, 2015)

Before ROSENBAUM, DUBINA and BLACK, Circuit Judges.

PER CURIAM:

On April 13, 2008, Joseph Benjamin Willis left Tallahassee, Florida on his motorcycle bound for Florida's Gulf Coast. As he headed south on U.S. Highway 319 near the Walmart Supercenter in Crawfordville, Florida, a Wakulla County deputy sheriff traveling north clocked him at 80 mph—25 mph over the posted limit. The deputy immediately turned around and set off in pursuit.

Thus began a high-speed chase that would ultimately involve at least six law-enforcement officers from four jurisdictions across two counties. Over the next 50 or so miles, Willis (1) rode hard in an effort to elude the officers, reaching speeds in excess of 110 mph, (2) veered onto the right shoulder to pass, (3) swerved into oncoming traffic across the double yellow line to pass, (4) forced oncoming traffic to take evasive action to avoid a head-on collision, (5) evaded two roadblocks set up by Franklin County deputies, and (6) attempted to barrel through a third roadblock set up by Apalachicola officers before crashing and suffering serious injuries.

Willis sued the Defendants[1] under 42 U.S.C. § 1983, alleging that their conduct during this high-speed chase constituted excessive force under the Fourth

---

[1] There are two groups of defendants:

- Franklin County Defendants: Sheriff Mike Mock (who was elected to replace Lloyd "Skip" Shiver during the pendency of this litigation), in his official capacity, and Deputies Lawrence Brannon and Randall Cook, in their individual capacities; and

2

and Fourteenth Amendments.  Finding no evidence of a constitutional violation, the district court granted summary judgment to the Defendants.

The gist of Willis's appeal is that the district court wrongly concluded that summary judgment was appropriate because it failed to credit his evidence and draw reasonable inferences therefrom in his favor.  After carefully reviewing the record and the parties' briefs, we affirm.

## I.

We review the district court's grant of summary judgment de novo.  *Myers v. Bowman*, 713 F.3d 1319, 1326 (11th Cir. 2013).

Like the district court, we "must consider the facts and the justifiable inferences in the light most favorable to the nonmoving party," which here is Willis.  *West v. Davis*, 767 F.3d 1063, 1066 (11th Cir. 2014).  "Summary judgment may be granted only if there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case.  An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357

---

- Apalachicola Defendants:  the City of Apalachicola, a municipal corporation, and Captain Steve James and Sergeant Chet Turner, in their individual capacities.

3

F.3d 1256, 1259–60 (11th Cir. 2004) (internal citations omitted)) (internal quotation marks omitted).

Additionally, Willis's evidence must be credited unless contradicted by the record. *See Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## II.

## A.

Willis testified that he saw the Wakulla County deputy driving north on U.S. 319 near the Crawfordville Walmart. He admits that he was speeding when he passed her and that "without thinking, [he] just tried to put a few cars in between [him] and where [he] had seen the cop." Doc. 41-1 at 7–8.[2] But he denies that he saw her behind him despite the flashing blue lights and blaring siren. He also denies that he heard her lay on the vehicle's air horn to try to get his attention. Indeed, he testified that he did not see another marked patrol car until the

---

[2] Willis was later charged with, and pleaded guilty to, reckless driving, fleeing from a police officer, possession of drug paraphernalia, and possession of cannabis.

4

Carrabelle Bridge—about 35 miles away.[3]  Whatever the reason, Willis did not stop in Wakulla County.

The Wakulla County Sheriff's Office contacted the Franklin County Sheriff's Office and asked them to be on the lookout for a motorcycle that had refused to stop.  The dispatcher described the motorcycle as silver with some red on it, and the rider as wearing a red helmet.  She also said that "he's run from us before, and you."  Doc. 46-1 at counter 352-02.[4]

**B.**

Charles Richards, a police officer in Carrabelle, responded to this request. He pulled his patrol car off U.S. Highway 98 near the entrance of a Franklin County golf course.  A few minutes later, a motorcycle, headed west toward downtown Carrabelle, passed at 62 mph.  While the bike and rider did not perfectly match the description, he still pulled out to initiate a routine traffic stop.  He then activated his dashboard camera along with his lights and siren.  But Willis didn't stop.[5]  And when he passed the vehicle in front of him, Officer Richards radioed that he was in pursuit of a fleeing motorcycle.

---

[3] Shortly after the deputy began to give chase, two more Wakulla County deputies saw a motorcycle traveling at high speed on U.S. 319 in the area.  Willis denies seeing them as well.

[4] Willis, however, rode a red motorcycle and wore a black helmet; additionally, this was his first time riding this route.  Given these discrepancies, he posits that another biker may have been riding recklessly in Wakulla County when he was.

[5] Willis admits that Officer Richards was in pursuit of him.  But he denies that he ever saw or heard him.  He surmises that this was because he had earphones in to listen to music and

5

Despite having neither seen the flashing lights nor heard the blaring siren, Willis raced away from Officer Richards.  Indeed, the video shows that he covered the 4.8 miles between the intersections of Z-Horse Charters and South East Avenue B in just 3 minutes and 3 seconds—at a blur-inducing average speed of 94.43 mph.  And while he slowed through downtown, he continued passing vehicles.  To do so, he swerved across the double yellow line, thereby forcing oncoming traffic to take evasive action to avoid a collision.[6]

After slaloming through downtown, Willis climbed the Carrabelle Bridge at about 65 mph.  Upon summiting this very high bridge, he saw a patrol vehicle blocking oncoming traffic.  But traffic in his lane continued to move, so he didn't stop.

This roadblock had been set up by Lawrence Brannon, a Franklin County deputy sheriff.  He had been in frequent radio contact with Officer Richards as he chased Willis through Carrabelle.  After Willis and Officer Richards passed, he joined the chase.

_____

his motorcycle was very loud.  Here, we credit his testimony without deciding whether the video renders this account too fantastic to believe.

[6] Willis says that he did not force any vehicles off the road; he infers that they exited the roadway in response to Officer Richards's emergency lights—the same lights that he never saw.

This inference, however, is unreasonable, and we reject it.  Regardless of the reason—whether to avoid a collision or to comply with state law—the other vehicles were driven from the roadway by Willis's reckless riding and unlawful failure to stop.  Even if he did not know that officers were pursuing him, the fact remains that his driving put the public in danger of loss of life or property.

Willis cleared the bridge and continued riding recklessly.  He opened the throttle, increasing his speed.  He passed vehicles in no-passing zones.  He passed vehicles using the right shoulder.  And he eventually disappeared from the pursuing officers' sight.

## C.

Randall "Duane" Cook, a Franklin County deputy, had been monitoring the Willis pursuit by radio.  Not long after Deputy Brannon joined the chase, he radioed Deputy Cook and said, "He ain't gonna stop, Duane.  If you want to, try to shoot his tire out."  Doc. 46-1 at counter 352-18.  To stop Willis, Deputy Cook set up a roadblock in the Yellow Hill area of Franklin County.  Just west of a bend, he parked his patrol car with its lights flashing in the middle of the road.

As for what happened next, Willis and Deputy Cook offer radically different accounts.  For purposes of our review, however, we accept Willis's version.

Willis testified that after spotting the roadblock, he slowed (from around 70 mph to around 50 mph) and prepared to stop.  As he got closer, he saw Deputy Cook standing behind his patrol car pointing a shotgun at him.  The deputy then fired twice, sending two 12-gauge slugs in his direction.  While neither he nor his bike were struck, Willis feared for his life.  So instead of stopping, he took off as fast as he could (about 115 mph).

Deputy Cook then returned to his patrol car and joined Officer Richards and Deputy Brannon in their high-speed pursuit of Willis.

7

**D.**

At the behest of Deputy Cook, Apalachicola police officers Steve James and Chet Turner set up a roadblock at the base of the John Gorrie Memorial Bridge. The roadblock consisted of two marked patrol SUVs parked nose-to-nose across the highway. As positioned, there was a gap of less than three feet between the vehicles and a gap of about five feet between each vehicle's rear bumper and the bridge's guardrail.

In Willis's version of events, as he traversed the half-mile straightway before the roadblock, Captain James and Sergeant Turner were positioned on the far side of their vehicles. Each leaned on the hood of his vehicle, weapon in hand: Captain James aimed his taser while Sergeant Turner targeted his service sidearm. As he approached, the officers gave no hand signals, nor did they appear to give any commands. Even so, he slowed to around 50 mph, sat up, and prepared to stop. At that point, he saw that the officers had their weapons trained on him.

Afraid that they were going to fire at him, Willis decided to try to shoot the gap between the vehicles. He failed. Right before the gap, the prongs from Captain James's taser struck him. His muscles convulsed, and his bike clipped the front of Sergeant Turner's SUV. He then crashed, skidding up the roadway on the bridge. When he finally came to a stop, he had suffered significant injuries for which he was airlifted to the hospital.

8

### III.

In his complaint, Willis alleged that Captain James and Sergeant Turner violated his Fourth Amendment rights and that the City of Apalachicola was deliberately indifferent to this violation. He also alleged that Deputies Brannon and Cook violated his Fourteenth Amendment rights and that Sheriff Mock was deliberately indifferent to this violation. The district court concluded that no constitutional violation occurred and thus granted summary judgment to the Defendants on all counts. For the reasons below, we conclude that the district court's grant of summary judgment was not reversible error.

### A.

Willis contends that the district court erred in granting summary judgment to Captain James and Sergeant Turner on his Fourth Amendment excessive-force claim.[7] We disagree.

### 1.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). To prevail on a Fourth Amendment excessive-force claim, the plaintiff must show

---

[7] In his complaint, Willis averred that Captain James and Sergeant Turner's conduct also violated his Fourteenth Amendment rights. On appeal, he admits that his § 1983 claim against them is governed by the Fourth Amendment's reasonableness standard because he was "seized" within the meaning of the Fourth Amendment.

9

both that a seizure occurred and the force used was unreasonable.  *See Troupe v. Sarasota Cnty., Fla.*, 419 F.3d 1160, 1166 (11th Cir. 2005).

A "seizure" for Fourth Amendment purposes occurs when "there is a governmental termination of freedom of movement through means intentionally applied."  *Brower v. County of Inyo*, 489 U.S. 593, 597, 109 S. Ct. 1378, 1381 (1989) (emphasis omitted).  A person who crashes into a law-enforcement roadblock and thus comes to a stop has been "seized" within the meaning of the Fourth Amendment.  *See id.* at 599, 109 S. Ct. at 1382 ("It was enough here . . . that according to the allegations of the complaint, [the plaintiff] was meant to be stopped by the physical obstacle of the roadblock—and that he was so stopped.").

 "The 'reasonableness' inquiry in an excessive force case is an objective one:  the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, *without regard to his underlying intent or motivation*."  *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004) (emphasis added).  As a result, the question whether Captain James and Sergeant Turner acted unconstitutionally must be answered from the perspective of a reasonable officer standing in their shoes at that time.  *E.g.*, *Lee*, 284 F.3d at 1197.

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . .  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly changing—about the force that is necessary in a particular situation.

10

*Troupe*, 419 F.3d at 1168 (quoting *Menuel v. City of Atlanta*, 25 F.3d 990, 996 (11th Cir. 1994)).

## 2.

Here, the district court correctly concluded that Willis was seized for Fourth Amendment purposes when he crashed into the roadblock set by Captain James and Sergeant Turner.  The district court thus erred by granting summary judgment to them only if a reasonable jury could conclude that setting up the roadblock or tasing Willis was unreasonable under the circumstances.

Willis asserts that a reasonable jury could reach such a conclusion.  In his view, the jury could infer that the roadblock was set up to entice him to enter the space between the vehicles so that Captain James could tase him, thus throwing him off balance and causing him to crash in a way that was certain to result in death or serious injury.  As support, he points to Deputy Cook's request that the officers construct the roadblock at the base of Gorrie Bridge "so he ain't got no way to go around."  We are unpersuaded by this argument.

For starters, Willis's hypothesis that the officers set up the roadblock intending to lure him into a trap is based on nothing more than rank speculation.  But speculation is not a substitute for evidence and cannot be used to stave off summary judgment.

Next, even if setting up the roadblock so that Willis had no way around or tasing him constituted the use of deadly force, this alone does not render the officers' conduct constitutionally unreasonable.  This is because even the

11

intentional use of deadly force does not necessarily violate the Fourth Amendment. *See Scott*, 550 U.S. at 383, 127 S. Ct. at 1778 ("Whether or not [the officer's] actions constituted application of 'deadly force,' all that matters is whether [his] actions were reasonable."); *see also Beshers v. Harrison*, 495 F.3d 1260, 1268 (11th Cir. 2007) (holding that "if [the officer] intentionally used deadly force to seize [the plaintiff], the use of force was reasonable" under the circumstances).

The use of deadly force can be constitutionally reasonable where a driver "intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight" from law enforcement. *E.g.*, *Scott*, 550 U.S. at 384, 127 S. Ct. at 1778; *Beshers*, 495 F.3d at 1268. That is the case here. This is true whether or not Willis knew that he was being chased by multiple officers from multiple jurisdictions across multiple counties. The fact is Willis's riding put himself and the public at risk or loss of life or property. And because the Fourth Amendment's reasonableness inquiry is conducted from the officers' perspective, not Willis's, *see Troupe*, 419 F.3d at 1168, it is irrelevant whether he decided to barrel through the roadblock and continue his headlong flight because he reasonably believed that the officers were going to fire their weapons at him.

In sum, we conclude that Captain James and Sergeant Turner's conduct did not violate Willis's Fourth Amendment rights and, therefore, the district court's grant of summary judgment as to them will be affirmed.

12

**B.**

To establish municipality liability under § 1983, a plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203 (1989). But "an inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred." *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996).

Here, neither Captain James nor Sergeant Turner violated Willis's constitutional rights. So Willis's claim against the City of Apalachicola fails. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 1573 (1986) (holding that neither the city nor its police commission had any § 1983 liability where the jury found that a police officer had not violated the plaintiff's constitutional rights). Accordingly, we conclude that the district court did not err in granting summary judgment to the city.

**C.**

Willis contends that the district court erred in granting summary judgment to Deputies Brannon and Cook on his Fourteenth Amendment excessive-force claim.[8] Again, we disagree.

---

[8] In his complaint, Willis averred that Deputies Brannon and Cook's conduct also violated his Fourth Amendment rights. On appeal, he admits that his § 1983 claim against them is governed by the Fourteenth Amendment's shocks-the-conscience standard because he was not "seized" within the meaning of the Fourth Amendment.

13

**1.**

Outside of the Fourth Amendment "search" or "seizure" context, the Supreme Court has recognized that an excessive-force claim may be based on substantive due process under the Fourteenth Amendment. *See County of Sacramento v. Lewis*, 523 U.S. 833, 843–45, 118 S. Ct. 1708, 1715–16 (1998). This protection, however, shields individuals from only arbitrary and oppressive uses of force. *Carr v. Tatangelo*, 338 F.3d 1259, 1271 (11th Cir. 2003). Put simply, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Lewis*, 523 U.S. at 846, 118 S. Ct. at 1716 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129, 112 S. Ct. 1061, 1071 (1991)). For this reason, the standard governing Fourteenth Amendment excessive-force claims is "shocks the conscience." *Id.*, 118 S. Ct. at 1717. "The standard for showing excessive force in violation of the Fourteenth Amendment, therefore, is higher than that required to show excessive force in violation of the Fourth Amendment." *Fennell v. Gilstrap*, 559 F.3d 1212, 1217 (11th Cir. 2009).

The Supreme Court has indicated that "conduct intended to injure in some way *unjustifiable by any government interest* is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 at 849, 118 S. Ct. at 1718 (emphasis added); *see also Carr*, 338 F.3d at 1271. If the conduct was "malicious[ ] and sadistic[ ]" and done "for the very purpose of causing harm," *Cockwell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21, 106 S. Ct. 1078, 1085 (1986) (internal quotation

14

mark omitted)), then it "necessarily shocks the conscience," *id.*  Otherwise, it does not.

**2.**

We agree with the district court's finding that Willis's Fourteenth Amendment excessive-force claim fails because he "presented no evidence to suggest that the actions of [Deputies] Brannon and Cook were motivated by anything other than the desire to stop [his] reckless driving, his high-speed flight from police, and his concomitant endangerment of the motoring public."  Doc. 52 at 11.

On appeal, Willis does not even address how Deputy Brannon allegedly violated his constitutional rights; instead, he focuses on Deputy Cook's actions. According to Willis, Deputy Cook, while safely behind his patrol car, which was parked in the middle of the road to create a roadblock, fired two shots at him as he was slowing down and preparing to stop at the roadblock.  Willis declares that this conduct satisfies *Lewis*'s shock-the-conscience test because it was done to cause him harm rather than to serve a legitimate law-enforcement purpose.

But Willis's declarations, no matter how adamant, are not a substitute for evidence.  More importantly, even if Deputy Cook fired his shotgun at him, the use of deadly force does not necessarily satisfy the Fourth Amendment's excessive-force standard, *see Scott*, 550 U.S. at 383, 127 S. Ct. at 1778, much less the more stringent standard under the Fourteenth Amendment, *see Fennell*, 559 F.3d at 1217.

15

Finally, Willis offers no evidence suggesting that Deputy Cook's actions were motivated by anything other than the law-enforcement purpose of ending Willis's dangerous, high-speed ride.  *See Vaughan*, 343 F.3d at 1333.

At bottom, even when Willis's evidence is credited and reasonable inferences therefrom are drawn in his favor, no reasonable jury could conclude that Deputies Brannon and Cook violated his Fourteenth Amendment rights. Accordingly, the district court's grant of summary judgment as to them will be affirmed.

### D.

"[S]upervisors are liable under § 1983 'either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation.'"  *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (quoting *Gonzalez v. Reno,* 325 F.3d 1228, 1234 (11th Cir. 2003)). A supervisor, however, cannot be liable under § 1983 "unless the supervised official committed an underlying violation of a constitutional right."  *Myers*, 713 F.3d at 1328.

Here, Deputies Brannon and Cook did not violate Willis's constitutional rights.  So Willis's § 1983 claim against Sheriff Mock fails.  *See Case v. Eslinger*, 555 F.3d 1317, 1328 (11th Cir. 2009) (affirming summary judgment granted to the county sheriff on a § 1983 claim because the plaintiff failed to show that the

16

supervised officer violated his constitutional rights).  According, we conclude that the district court did not err in granting summary judgment to Sheriff Mock.

## IV.

Having carefully considered the record in this case, we conclude that there is no merit to any of the arguments made by Willis.  Accordingly, we affirm the district court's grant of summary judgment.

AFFIRMED.

17